**UNITED STATES of America**
Plaintiff—Appellee,

v.

Franklin John BLACK;  Catherine
Isaacs (now) Black Defendants—
Appellants.

No. 99–6117.

United States Court of Appeals,
Sixth Circuit.

April 18, 2001.

Before WELLFORD,
SUHRHEINRICH, and MOORE, Circuit
Judges.

PER CURIAM.

In this appeal following remand, Defendants Franklin John Black and Catherine Black appeal the district court's denial of their motion to suppress.  Defendants argue that (1) police used observations obtained unlawfully from within Defendants' curtilage in obtaining the search warrant, (2) the warrantless use of a thermal imaging device violated the Fourth Amendment, and (3) the court erred in ruling that Defendants had not met their burden of proof under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), with respect to three challenged statements in the affidavit used to obtain the warrant.  The United States argues that even if Defendants' Fourth Amendment rights were violated, the evidence obtained pursuant to the warrant is sheltered from exclusion by *United States v. Leon*, 468

U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). We AFFIRM.

## I.

During 1997, Detective Mark Cool of the Kentucky State Police ("KSP") was investigating indoor cannabis operations in Boyle County, Kentucky. On June 11, 1997, Jason Stephens, who was suspected of operating an indoor cannabis facility, informed Detective Cool that he had obtained marijuana from "John and Cathy,"[1] who also operated an indoor facility on their Tank Pond Road property.

Detective Cool contacted Sheriff Karl Luttrell of the Boyle County Sheriff's Office and learned that marijuana-related complaints had been made about John and Cathy Black, who lived in the Tank Pond Road area. Detective Cool also contacted Trooper George Canter of the KSP who confirmed that he had received similar complaints concerning Defendants. Finally, Detective Cool spoke with Detective Rick Ledford of the KSP, who, using information provided by the DEA, confirmed that Cathy Black had purchased equipment commonly used in indoor marijuana production.

That night, Detective Cool sent officers to Defendants' rural residence for further investigation. Defendants' house, which sits about one-fourth of a mile from their property line, is reached by Chestnut Grove, a private road. Past the house, a two or three car-length driveway intersects Chestnut Grove and leads to a carport. Beyond the driveway, Chestnut Grove runs to the shed which was the subject of the officers' investigation. The shed is approximately five feet from the carport, at least fifty feet from the house,

and three to five feet from Chestnut Grove. Chestnut Grove continues past the shed to the next tract of land, but consists only of two trenches worn by the tires of vehicles.

When the officers dispatched by Cool arrived at Defendants' property on June 11, 1997, they parked their vehicles on Chestnut Grove near the carport. Thus, the officers were within approximately five feet of the shed, but over fifty feet away from the house. The officers then made several observations from their vehicles. First, a bright light emanated from within the shed, and Trooper Tony Perkins, Trooper George Canter and Detective Ledford testified that they could see marijuana plants through a crack in the wall of the building. Detective Ledford and Trooper Perkins, who were both familiar with marijuana odor, also testified that they could smell marijuana from the vehicle. Finally, a thermal imaging survey revealed significant amounts of heat escaping from the shed.

The officers secured the scene and obtained a search warrant. The affidavit in support of the warrant contained the information obtained from Stephens, as well as the confirmation by Boyle County authorities and Trooper Canter that marijuana-related complaints had been lodged against Defendants. It stated that DEA records confirmed that Defendant Cathy Black had purchased equipment used for growing marijuana indoors. An attachment to the affidavit also recited the officers' observations upon arriving at Defendants' residence, and the results of the thermal imaging survey. The ensuing search produced a total of 620 marijuana

---

1. At various points in the record, Defendant Cathy Black is referred to as "Kathy" or "Kathy Black." For purposes of consistency, she is referred to in this opinion solely as "Cathy" or "Cathy Black."

plants inside two out-buildings on Defendants' property.[2]

On August 7, 1997, a federal grand jury returned a three-count indictment against Defendants. Count One charged them with manufacturing over one hundred marijuana plants. Count Two charged them with aiding and abetting in the possession of marijuana with intent to distribute. Count Three sought the forfeiture of Defendants' real property.

On August 15, 1997, Defendants pleaded not guilty to the charges. On September 2, 1997, Defendants filed a joint motion to suppress. The court denied the motion, and shortly thereafter Defendants sought to change their plea. On the day of their re-arraignment, Defendants filed a supplemental motion to suppress and a motion to reconsider, which the court subsequently denied. Defendants then entered conditional guilty pleas to Counts One and Two, and agreed to forfeit the property set forth in Count Three. On January 16, 1998, Defendants were each sentenced to thirty months' imprisonment under the safety valve provision of 18 U.S.C. § 3553(f).

On May 11, 1999, this Court vacated the district court's order denying Defendants' motion to suppress and remanded the case for an evidentiary hearing. *United States v. Black*, No. 98-5155, 1999 WL 357759 (6th Cir. May 11, 1999) (unpublished per curiam). We reasoned that Defendants were entitled to a hearing on essentially five issues: (1) whether Jason Stephens' tip had been misrepresented by the police in the application for a search warrant, (2) whether the officers present at the Black residence actually smelled marijuana from their vehicles, (3) whether the officers actually saw marijuana plants through a crack in the wall of the shed, (4) whether

the officers made their observations from within the curtilage of the home, and (5) whether the thermal scan of the shed violated Defendants' Fourth Amendment rights. *Id.* at *3–4.

The district court held an evidentiary hearing on July 30 and August 3, 1999. Subsequently, the court denied Defendants' motion to suppress in a written Opinion and Order. The court concluded that (1) Defendants' Fourth Amendment rights had not been violated because the portion of Chestnut Grove from which the officers made their observations was not part of the curtilage of Defendants' residence, and (2) Defendants had not met their burden under *Franks* of establishing that the information in the affidavit was knowingly false or made with reckless disregard for the truth. Notably, the court also concluded that the even without the thermal imaging evidence, the facts contained in the affidavit were sufficient to justify the warrant. Therefore, the court did not consider whether the use of the thermal imager itself violated Defendants' Fourth Amendment rights.

## II.

### A.

■ We first address Defendants' contention that the court erred in denying their motion to suppress because the police used unlawful observations made from within Defendants' curtilage in procuring the search warrant. Defendants argue that the officers' observations from Chestnut Grove, including the thermal image scan, were made from within the curtilage of their home, which by definition is the area "so intimately tied to the home itself

---

2. Plants were located in the shed observed by the officers, as well as on the second floor of a "block building" used to store farm equipment, which was situated within five feet of the shed, approximately at the point where Chestnut Grove disintegrated into "two ruts."

that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). If the observations were made from within the curtilage, Defendants assert that these observations were illegal, and therefore tainted the affidavit. Defendants assert, under the "fruit of the poisonous tree" doctrine, that this taint requires suppression of the evidence gathered in the search conducted pursuant to the warrant.

We reject Defendants' argument, and we note that in so doing, we need not even reach the question of whether the officers' observations came from within the curtilage of Defendants' home. Rather, under the fruit of the poisonous tree doctrine, the question we must address is whether, despite any impermissibly tainted factual averments in the affidavit, the warrant nevertheless issued upon probable cause.[3] *United States v. Herrold*, 962 F.2d 1131, 1138 (3d Cir.1992); *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir.1987) (holding that "[t]he mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant.... A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant"). If probable cause did exist

even without consideration of the challenged observations, then Defendants' argument fails.

This Court reviews a district court's factual findings on a motion to suppress for clear error, and its conclusions of law *de novo*. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir.1993). Although we owe no particular deference to the conclusions of the district court, which sat as a reviewing court, we must pay " 'great deference' " to the state judge's findings, which " 'should not be set aside unless arbitrarily exercised.' " *Id.* at 1362–63 (quoting *United States v. Pelham*, 801 F.2d 875, 877 (6th Cir.1986) (citing *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983))). " '[L]ine-by-line scrutiny [of an underlying affidavit is] ... inappropriate in reviewing [a state judge's] decisions." ' *United States v. Allen*, 211 F.3d 970, 972 (6th Cir.2000) (quoting *Gates*, 462 U.S. at 230 n. 14). Notwithstanding, the state judge must have been neutral, detached and more than a mere rubber stamp for the police. *United States v. King*, 227 F.3d at 739 (citing *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)).

Here, apart from the challenged observations, the affidavit included the tip provided by Jason Stephens, who was under investigation for growing marijuana indoors. As described in the affidavit, Stephens stated that he had "obtained" mari-

---

**3.** The contours of probable cause have been established by Supreme Court precedent, and have been dutifully explored by other panels within this Circuit. Our task is to determine whether, under the totality of the circumstances, the state court judge had a substantial basis for concluding that "a search would uncover evidence of wrongdoing." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In reviewing the affidavit, we do not look for "magic words," and we judge it based "on

the adequacy of what it does contain, not what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 974 (6th Cir.2000). Stated differently, the judge must " 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying the hearsay information,' probable cause exists." *King*, 227 F.3d at 740 (quoting *Gates*, 462 U.S. at 238).

juana from "John and Cathy," who grew marijuana indoors at their Tank Pond Road area residence. In *Allen,* 211 F.3d 970 (6th Cir.2000), this Circuit recently addressed the role that an informant's tip may play in the probable cause determination. In such cases, we must examine factors which, although not " 'separate and independent requirements to be rigidly exacted in every case,' " should be weighed in assessing the value that should be afforded to the tip. *Allen,* 211 F.3d at 973 (quoting *Gates,* 462 U.S. at 230). "These factors, which consist of the 'veracity' or 'reliability' as well as 'basis of knowledge' of the tip, are relative where the strength of one factor may compensate for the deficiency of another." *King,* 227 F.3d at 740 (quoting *Gates,* 462 U.S. at 230–32). In other words, "[the] determination does not lend itself to the application of '[r]igid legal rules,' and no one decision may serve to provide a definitive basis upon which to rely inasmuch as 'informant's tips, like all other clues and evidence ... may vary greatly in their value and reliability.' " *King,* 227 F.3d at 739 (quoting *Gates,* 462 U.S. at 232). At bottom, based on the information presented, the judge must be able to independently determine probable cause; his determination cannot merely ratify the "bare conclusions" of others. *Id.; Allen,* 211 F.3d at 975.

Although Stephens was not named in the affidavit, he was described as a "suspect" of the ongoing investigation. Thus, it was clear to the reviewing judge that Stephens was known to the affiant, and that his tip bore more indicia of reliability than if it had been made anonymously. Additionally, it is significant for purposes of veracity and reliability that in the process of implicating Defendants, Stephens made statements against his own penal interest. *United States v. Southern,* No. 99–1736, 2000 WL 1769633, at \*4 (6th Cir. Nov. 16, 2000) (unpublished). We think

that such statements are inherently more truthful and reliable than statements which do not implicate the informant.

In addition to the indicia of reliability inherent in Stephens' tip, we also note that it was corroborated by independent police investigation. Detective Cool contacted Sheriff Luttrell and Trooper Canter, both of whom confirmed that they had received "complaints" that John and Cathy Black, who lived in the Tank Pond Road area, had been cultivating marijuana indoors. Although no specific complaints were identified, the mere confirmation that a "John and Cathy" lived in the Tank Pond Road area lends some credibility to Stephens' information. Moreover, Detective Cool contacted Detective Ledford, a specialist in indoor marijuana operations, who corroborated Stephens' tip against information provided by the United States Drug Enforcement Agency, which indicated that Cathy Black had previously purchased equipment used for the indoor production of marijuana.

Given the totality of the circumstances, we find on these facts a substantial basis for concluding that a search would uncover evidence of wrongdoing even without consideration of the officers' observations at Defendants' residence prior to obtaining the warrant. Although Defendants claim that Stephens' information was not "first hand," this alone is not dispositive for purposes of a probable cause determination, which may be based entirely on hearsay, so long as a substantial basis exists for crediting the hearsay. *Jones v. United States,* 362 U.S. 257, 269–70, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Fed.R.Crim.P. 41(c)(1) (stating that a warrant may issue based on hearsay in whole or in part). Taking into consideration Stephens' tip, which went against his own penal interest and was corroborated by the local sheriff and another Kentucky State Police officer,

as well as information supplied by the DEA, the state judge had a substantial basis for crediting Stephens' tip, and could independently determine probable cause. Therefore, the district court properly determined that the fruit of the poisonous tree doctrine does not require exclusion of the evidence obtained from Defendants' property pursuant to the warrant. As a result, we decline to address the United States' argument that the officers are entitled to good faith immunity under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

### B.

■ Next, we consider whether the court erred in concluding that Defendants failed to demonstrate, under *Franks,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), that the information in the affidavit supporting the warrant was knowingly false or made with reckless disregard for the truth. A defendant must prove this assertion by a preponderance of the evidence. *Id.* at 156. If the burden is satisfied, then the false information is extracted from the affidavit and the remaining information is reexamined to determine whether, under the totality of the circumstances, a finding of probable cause is still supported. *Id.*

Defendants make three separate arguments concerning the *Franks* hearing: (1) that Detective Cool lied in the affidavit about the "tip" he had received from Jason Stephens; (2) that the officers lied about smelling marijuana from their vehicle; and (3) that the officers lied about seeing marijuana through a crack in the wall of the shed.

Because we have concluded that the affidavit supported a finding of probable cause even without consideration of the information gathered at Defendants' residence, we need only address Defendants' argument that Detective Cool lied in the affidavit about the "tip" he had received from Jason Stephens. Specifically, as noted above, the affidavit stated that Stephens had "obtained" marijuana from individuals known to him only as "John and Cathy," who were growing marijuana indoors on their property located in the Tank Pond Road area. Later, however, Stephens testified that the affidavit misrepresented the information he had given to the police. Stephens maintained that he never told Cool that he had actually "purchased" marijuana from Defendants, but only that he had obtained marijuana from someone who had obtained it from "John and Cathy" in the Tank Pond Road area. Thus, Defendants assert that Cool lied about the nature of the evidence, inasmuch as the affidavit characterizes it as "first-person" knowledge rather than "second-hand" knowledge. Defendants also point to the police report, which states that Stephens admitted to having "purchased" marijuana from "John and Cathy" within the past week.

The district court concluded that, for *Franks* purposes, there was no discernible difference between "obtaining" marijuana directly from "John and Cathy" via sale or gift, and smoking marijuana with someone else who had obtained it from them. The court noted that "either way, Jason Stephens possessed marijuana once owned by 'John and Kathy.'" Thus, the court concluded that Defendants had not established that the statement was knowingly false or made with reckless disregard.

We affirm the district court on this issue. Nothing in Stephens' testimony is inconsistent with Detective Cool's statement in the affidavit because Stephens had, in fact, obtained marijuana from Defendants. Simply that Detective Cool used the term "purchased" in the police report does not suggest that he lied or recklessly disregarded the truth in the affidavit.

Nor do we believe that the mere fact that Stephens may have obtained marijuana from Defendants indirectly, rather than directly, demonstrates that Detective Cool lied or was reckless in drafting the affidavit. Therefore, we affirm the determination that Defendants failed to meet their burden under *Franks*.

### C.

Defendants also contend that the mere use of the thermal imaging device, regardless of whether it was used from within the curtilage of their residence, by itself constituted a violation of the Fourth Amendment.[4] Because we have concluded that the affidavit was sufficient to establish probable cause even without the information gathered at Defendants' residence, we decline to address Defendants' argument.

### III.

Therefore, we AFFIRM the judgment of the district court.

HARRY W. WELLFORD, Circuit Judge, concurring.

HARRY W. WELLFORD, Circuit Judge.

This is a difficult case which has occupied a district judge and concerned this court over a considerable period of time. It involves a close question regarding the extent of curtilage in a rural area, probable cause for the issuance of a search warrant, and other issues concerning the legality of a search of rural outbuildings by Kentucky police.

### I. *CURTILAGE*

Defendants challenge the observations and thermal imaging conducted by police officers in the course of their investigation of defendants because allegedly they took place within the curtilage of the defendants' home prior to issuance of the contested search warrant. I would affirm the district court's analysis of this issue, first to the effect that the relevant portion of Chestnut Grove Road used by the officers to make observations was not within the curtilage. Thus, evidence of the observations made, the smelling of marijuana, and thermal imaging from the road did not take place within the curtilage, and were therefore properly taken into account by the judge issuing the warrant. Although the issues are close, I find no error in this curtilage determination by the district judge.

### II. *PROBABLE CAUSE (APART FROM THERMAL IMAGING)*

I concur also in this court's decision that the informer's tip, especially as a "suspect" in area drug operations, "corroborated by independent police investigation" (apart from thermal imaging), including the officers' observations at the scene, furnished sufficient probable cause under the totality of the circumstances for the state judge's issuance of the search warrant. Apart from the thermal imaging survey by detective Ledford, I conclude that the actions of the officers, as set out by the district court, were: (1) based upon adequate and reasonable police investigation; (2) based upon a totality of circumstances indicating probable cause to believe that defendants

---

4. On February 20, 2001, the United States Supreme Court heard oral argument in *United States v. Kyllos*, 190 F.3d 1041 (9th Cir. 1999), *cert. granted*, 530 U.S. 1305, 121 S.Ct. 29, 147 L.Ed.2d 1052 (Sept. 26, 2000) (No. 99–8508), a case which squarely presents the Fourth Amendment implications of thermal imaging. Because we have decided the case at bar on other grounds, we need not issue a stay pending the outcome of *Kyllo*.

were engaged in an illegal marijuana operation; and (3) were not reckless, arbitrary, flagrant, dishonest, nor even negligent. That much of the information obtained about defendants was based upon hearsay does not render the information unreliable under the circumstances. The affidavit of detective Cool adequately set forth the background circumstances in his affidavit for a search warrant. It describes the location of the property to be searched in detail, together with outbuildings purportedly possessed by defendants. The affidavit was adequate for the judge's determination of probable cause for the search, again apart from any thermal imaging utilized.

### III. FRANKS *CHALLENGE TO AFFIDAVIT*

After conducting a *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), hearing, mandated upon remand, the district court found no demonstrated violation by detective Cool of the Kentucky State Police of the *Franks* requirements. I agree with our conclusion of the correctness of the district court's finding that defendants failed to show either "deliberate falsehood or ... reckless regard for the truth" in the submission of the challenged affidavit. *Franks,* 438 U.S. at 171.

### IV. *THERMAL IMAGING*

The court, in *United States v. Ishmael,* 48 F.3d 850 (5th Cir.1995), considered the government's use of thermal imaging in investigating marijuana production in outbuildings in a remote, rural area. *Ishmael* found the practice to be constitutional, not an unreasonable invasion of privacy in somewhat comparable circumstances to those involved in this case. In that case,

the defendant attempted to conceal the marijuana activity, and he, like the Blacks, exhibited subjective expectations of privacy. The Fifth Circuit found no constitutional violation in the use of the thermal imaging device under those circumstances and reversed the district court's suppression of evidence obtained by the use of the device. *Ishmael,* 48 F.3d at 856; *see also United States v. Myers,* 46 F.3d 668 (7th Cir.1995), and *United States v. Ford,* 34 F.3d 992 (11th Cir.1994).[1] See also the earlier case of *United States v. Pinson,* 24 F.3d 1056 (8th Cir.1994), reaching the same conclusion. The Ninth Circuit joined the chorus of agreement on the issues in *United States v. Kyllo,* 190 F.3d 1041 (9th Cir.1999), *cert. granted,* 530 U.S. 1305, 121 S.Ct. 29, 147 L.Ed.2d 1052 (2000). *Compare United States v. Cusumano,* 67 F.3d 1497, 1504 n. 11 (10th Cir.1995), *vacated on other grounds,* 83 F.3d 1247 (10th Cir. 1996) (en banc), as noted in *United States v. Elkins,* 95 F.Supp.2d 796 (W.D.Tenn. 2000) (expressing a distinctly minority view).

I am persuaded by the virtuously unanimous authority on the thermal imaging issue that the use of this equipment did not violate defendants' constitutional rights with respect to the outbuildings on the subject property. I would add this evidence, therefore, to the other evidence addressed in considering whether there was probable cause for the search under the totality of circumstances.

### V: *APPLICABILITY OF* LEON

*United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1983), decided that "evidence obtained by offers acting in reasonable reliance on a search warrant

---

1. The Eleventh Circuit reiterated this result in *United States v. Robinson,* 62 F.3d 1325 (11th Cir.1995), noting no contrary authority.

issued by a detached and neutral magistrate" may be admissible in a criminal trial even if "ultimately found to be unsupported by probable cause."[2] *Id.* at 900, 104 S.Ct. 3405. The Court's opinion in *Leon* considered the tension in such cases between "unreasonable invasions of privacy" and admission of "evidence which exposes the truth." *Id.* at 900–01 (quoting *Alderman v. United States*, 394 U.S. 165, 175, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)). Like the instant case, *Leon* included drug involvement of a defendant who challenged the basis for the search warrant involved, because it was "devoid of information establishing the informants' reliability" and because the information contained in the affidavit was stale and "these deficiencies had not been cured by police investigation." *Id.* at 904–05.

*Leon* considered or assessed, in making its analysis as to admissibility of evidence of illicit drug conduct, despite the aforesaid deficiencies in the search warrant process, "the flagrancy of the policy misconduct." *Id.* at 911. It also considered whether in that process the search had been made in "good-faith reliance" on the warrant, comparable to a good-faith arrest by a police officer based upon his reliance upon an apparently valid statute. *Id.* at 911. *See Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979).

> Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according "great deference" to a magistrate's determination.

*Spinelli v. United States*, 393 U.S.[410,] 419[,, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)]. See *Illinois v. Gates*, 462 U.S. at 236; *United States v. Ventresca*, supra, [380 U.S. 102,] at 108–109[,, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)].

*Leon*, 468 U.S. at 914, 104 S.Ct. 3405. The issuing magistrate must, however, have "a substantial basis for determining the existence of probable cause; *Illinois v. Gates*, 462 U.S. at 239," *id.* at 915, 104 S.Ct. 3405, looking to the "totality of the circumstances." *Leon* emphasized both that "the exclusionary rule is designed to deter police misconduct" and "the extreme sanction of exclusion." *Id.* at 916. Finally, the Court in *Leon* observed that it was only in the "unusual case" that exclusion of evidence would "further the purposes of the exclusionary rule." *Id.* at 918. Such rule of exclusion "cannot be expected: ... to deter objectively reasonable law enforcement activity." *Id.* at 919. "Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its value." *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975), *quoted in Leon*, 468 U.S. at 919.[3]

Not only must the officer's conduct be in objective good faith in this situation, his "reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant ... must be objectively reasonable." *Id.* at 922. More than that, the courts must look to whether the officers in this case acted in a "dishonest" or "reckless" fashion in preparing the affidavit in question, or that they could not

---

**2.** The government's petition for certiorari presented the question whether, under the Fourth Amendment, "evidence seized in reasonable good faith reliance on a search warrant that is subsequently held to be defective" should be upheld. *Id.* at 905, 104 S.Ct. 3405.

**3.** The Court applied an objective test of the good faith of police officers particularly "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920, 104 S.Ct. 3405.

reasonably have believed there was probable cause to effect the search at issue.

Applying the aforesaid principles from the landmark *Leon* decision, I believe that the evidence obtained of illegal marijuana production in the Black outbuilding should not have been excluded. The following findings of the district court with respect to the actions of the Kentucky police and the issuance of a warrant by Kentucky Judge Shewmaker demonstrate that these actions were taken in good faith and were objectively reasonable.

## VI. *CONCLUSION*

The district court was not in error in overruling defendants' motion to suppress for all of the reasons stated. In addition, I would hold the thermal imaging under the circumstances not to have violated defendants' constitutional rights. Finally, I would hold that the actions of the police met the *Leon* reasonable good-faith standards. Accordingly, I concur in affirming the decision of the district court.

MOORE, Circuit Judge, concurring.

I would hold that the officers' observations came from within the curtilage of defendants' home. Nonetheless, I agree with the per curiam opinion that we need not resolve that issue, or the question of thermal imaging, in this case. After excising the portions of the affidavit relating to thermal imaging and the officers' observations from the curtilage, I must conclude that the non-tainted averments in the affidavit were adequate under current Sixth Circuit precedents to provide probable cause for issuing the warrant.